## **AFFIDAVIT OF TASK FORCE OFFICER SCOTT F. DUNN**

I, Scott F. Dunn, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

### **INTRODUCTION**

1.      I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") of the United States Department of Justice since October 2013.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United States Code. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), *i.e.*, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

### *A.      Training & Experience: Narcotics Investigations*

3.      I am a State Trooper with the Massachusetts State Police ("MSP"), and have been so employed since December 2000. I have been assigned to the DEA as a Task Force Officer since October 2013. Prior to my assignment at DEA, I was assigned to the Plymouth County District Attorney's Office, where I worked in the narcotics unit for over nine years. During my employment with MSP and assignment at DEA, I have participated in hundreds of investigations relating to the distribution of controlled substances. I have received extensive training on all aspects of drug investigations, including the methods used to package, transport, store, and distribute drugs, and the methods used by drug traffickers to conceal and launder the proceeds of their activities. Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including how drugs are transported, distributed and stored, and how drug proceeds are collected and handled. Specifically, I am familiar with the manner in which drug

traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and drug proceeds

4.      During my time as a narcotics investigator, I have participated in hundreds of investigations involving all facets of the narcotics industry, including smuggling, money seizures, and property seizures. I have participated in investigations in both overt and undercover capacities. Over the course of my career in law enforcement, I have served as the affiant in numerous search warrants and Global Positioning System ("GPS") warrants. I have personally participated in investigations involving conventional and electronic surveillance, as well as the authorized electronic interception of conversations.

5.      Furthermore, I have participated in numerous investigations in which controlled purchases of narcotics have been made by undercover officers and cooperating witnesses. These narcotics purchases included a wide-ranging assortment of controlled substances, including heroin, cocaine, ecstasy, marijuana, and oxycodone, and ranged in quantity from small "street-level" purchases to larger "trafficking" weight purchases. I have also interrogated numerous defendants and suspects who were users, sellers, and distributors of illegal narcotics, and have also interviewed and debriefed cooperating witnesses and confidential informants concerning the distribution of illegal narcotics.

6.      On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

7.          Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

### B.          *Experience In Present Investigation*

8.          I have personally participated in the investigation of the people named in this affidavit since approximately January 2015. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

(1)     My training and experience investigating drug-trafficking;

(2)     Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

3

(3)     Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

(4)     Confidential sources of information;

(5)     Public records;

(6)     Business records;

(7)     Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

(8)     GPS tracking device data;

(9)     Controlled purchases of drugs;

(10)    Drug and firearms seizures;

(11)    Queries of law enforcement records and intelligence databases; and

(12)    Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

9.      This affidavit is being submitted in support of a criminal complaint against the following individuals:

(1)     Marvin ANTOINE, a/k/a "D," a/k/a "Dirty" ("ANTOINE");

(2)     Lutherson BONHEUR, a/k/a "Boog" ("BONHEUR");

(3)     ▐▌▌▌▌▌▌

▌   ▌▌▌▌▌▌▌▌▌

▌   ▌▌▌▌▌▌

(collectively, the "Defendants") charging that beginning at least in or about January 2015 and continuing until the present, each did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown, to possess with intent to distribute and

4

to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§841(a)(1) and

846.

10.     This affidavit is also being submitted in support of applications for search warrants for

the following target locations, which are described in greater detail below and in attachments to

the relevant warrant applications and warrants:

> (1)     17 Foster Street, Apartment 6, Brockton, Massachusetts (hereinafter, the
> "MARVIN residence" or "Target Location #1");
>
> (2)     175 Menlo Street, First Floor and basement, Brockton, Massachusetts
> (hereinafter, "175 Menlo Street" or "Target Location #2");
>
> (3)     2075 Dorchester Avenue, Dorchester, Massachusetts (hereinafter, "2075
> Dorchester" or "Target Location #3); and
>
> (4)     ███████████████████████████████████████████████

(collectively, the "Target Locations").

11.     This affidavit does not set forth all the facts developed during the course of this

investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish

probable cause to believe that the Defendants identified herein have committed the above-

described controlled substance offenses and that evidence, fruits, and instrumentalities of these

offenses will be found in the Target Locations as described below.

## SUMMARY OF EVIDENCE

## I.     Background of the Investigation

12.     The DEA began investigating the drug and human trafficking activities of

ANTOINE and his associates in 2015. Through the use of confidential sources, sources of

information, physical surveillance, pole cameras, controlled purchases of heroin, analysis of

telephone toll records, the use of court-authorized GPS tracking devices, pen register/trap and

5

trace, and court-authorized wiretaps of telephones used by ANTOINE, BONHEUR and their associates, agents have established that ANTOINE operates a large-scale heroin drug trafficking organization ("DTO") and sex trafficking business in the Brockton and Cape Cod areas of Massachusetts. The DTO operated by ANTOINE is referred to herein as "the ANTOINE DTO." Investigators have identified a number of criminal associates working for the ANTOINE DTO, a heroin supplier to the DTO, and a number of customers.

13.    Between January and April 2015, a confidential source ("CS") and a cooperating witness ("CW1") working with the DEA made a combined total of eight controlled purchases of heroin from the ANTOINE DTO. ANTOINE uses couriers, including              to sell varying amounts of heroin, including quarter "fingers" (2.5 grams) or full "fingers" (10 grams).[1] Multiple sources also reported that ANTOINE stores guns and drugs in locations in Brockton, and that he uses couriers to deliver heroin to his customers. Officers have seen members of the ANTOINE DTO coming in and out of ANTOINE's residence, 17 Foster Street, and 175 Menlo Street, Brockton (hereinafter, "175 Menlo Street"), in a manner which indicates these locations are used as storage locations for drugs and firearms. Investigators have seen ANTOINE leaving Target Location #1 immediately prior to drug purchases and returning to that location after collecting drug proceeds and selling heroin. Investigators have intercepted numerous calls in which ANTOINE, BONHEUR,              and others refer to Target Location #2 as the "trap" or the "triz," and have seen what appeared to be numerous drug transactions occurring from this location.   Agents have seen ANTOINE and

              on numerous occasions, and as described below, intercepted calls indicate that

---

[1] Based on my training and experience, I know the term "finger" is a slang term used to describe 10 grams of heroin that is pressed into a cylinder shape.

6

████████ runs the prostitution business from her residence and stores drug and prostitution proceeds at her residence.

### *Title III Electronic Surveillance*

14.     On September 18, 2015, the Honorable F. Dennis Saylor (District of Massachusetts) authorized the interception of wire and electronic communications over (781) 856-4792, a telephone used by ANTOINE (15-mc-91312).     Interceptions over that phone (hereinafter, "Target Telephone #1") were terminated on October 12, 2015.

15.     On September 18, 2015, the Honorable David H. Hennessy (United States Magistrate Judge, District of Massachusetts) signed a warrant authorizing the government to obtain precise location information about Target Telephone #1.     A description of the investigation to date was detailed in my September 18, 2015 Affidavit in support of the warrant, which I incorporate by reference (herein, "September 18 Dunn Affidavit"), and those facts are not repeated in full in this Affidavit.

16.     On September 25, 2015, Judge Saylor authorized the interception of wire and electronic communications over (508) 468-4281, telephone used by ANTOINE (15-mc-91312). Interceptions over that phone (hereinafter, "Target Telephone #2") were terminated on October 20, 2015. Also on September 25, 2015, Magistrate Judge Hennessy signed a warrant authorizing the government to obtain precise location information about Target Telephone #2. A description of the investigation to date was detailed in my September 25, 2015 Affidavit in support of the warrant, which I incorporate by reference (herein, "September 25 Dunn Affidavit"), and those facts are not repeated in full in this Affidavit.

17.     On October 19, 2015, Judge Saylor authorized the continued interception of wire and electronic communications over Target Telephone #2, and the initial interception of wire and

electronic communications over (617) 806-6943 (hereinafter, "Target Telephone #3"), a telephone used by ANTOINE and (617) 543-0287 (hereinafter, "Target Telephone #4"). ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Interceptions over Target Telephones #2, #3 and #4 were terminated on November 18, 2015.

18.     On November 12, 2015, Judge Saylor authorized the interception of wire and electronic communications over (617) 291-6828 ("Target Telephone #5), a phone used by ANTOINE and (339) 226-1032 ("Target Telephone #6), a phone used by BONHEUR. Interceptions over Target Telephones #5 and #6 pursuant to that order are ongoing. On November 6, 2015, Magistrate Judge Hennessy signed a warrant authorizing the government to obtain precise location information about Target Telephones #5 and #6. A description of the investigation to date was detailed in my November 6, 2015 Affidavit in support of the warrant, which I incorporate by reference (herein, "November 6 Dunn Affidavit"),

19.     Since interceptions began in September 2015, investigators have intercepted ANTOINE ordering heroin from his sources, including Target Subjects ▮▮▮▮▮▮▮▮▮▮ and directing other Defendants to process and distribute heroin, and to collect drug proceeds; ANTOINE and BONHEUR were intercepted arranging the sale of a firearm, which was later recovered by officers and determined to have been used in a recent homicide; ANTOINE and BONHEUR were also intercepted numerous times discussing the distribution of heroin and the collection of drug proceeds from customers of the ANTOINE DTO; and ANTOINE and BONHEUR were intercepted discussing the prostitution business run by the ANTOINE DTO.

8

## II.  Representative Drug Purchases, Drug Seizures, and Intercepted Communications

20.     Over the course of this investigation, federal agents and task force officers have purchased and seized approximately 120 grams of heroin from ANTOINE and his associates either provided to customers (*i.e.*, a confidential source, a cooperating defendant, and a cooperating witness) or held as supply to distribute to customers. Some of those controlled purchases and seizures of heroin, along with related intercepted communications, are described herein. Below, I also describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information. I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation. Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision. All times referenced herein are approximate.

### A.     *Controlled Drug Purchases by Confidential Source*

21.     In early 2015, the Massachusetts State Police ("MSP") sought the assistance of the DEA, after receiving information from a cooperating source ("CS1") during an investigation into a fatal heroin overdose. Specifically, CS1 told MSP troopers that a black male, approximately 30 years old, known as "D," (later identified as ANTOINE), provided CS1 and the decedent with the heroin used by the decedent. CS1 agreed to cooperate and subsequently made four controlled purchases of heroin from ANTOINE. Investigators and agents began

9

linking together information obtained from other sources and cooperating witnesses to identify members of the ANTOINE DTO and understand the scope of its criminal conduct.

22.     From January 2015 through April 2015, the CS and cooperating witness ("CW1") assisted investigators by making a total of eight controlled purchases of heroin from ANTOINE and his associates. In addition to controlled purchases, law enforcement officers conducted physical surveillance on ANTOINE and his criminal associates, including            and BONHEUR, and determined that on a near daily basis ANTOINE left his residence to meet his criminal associates at 175 Menlo Street to arrange for the distribution of drugs. ANTOINE, BONHEUR and BONHEUR were all seen at 175 Menlo Street on a near daily basis.

and BONHEUR made numerous trips back and forth between Brockton and various addresses on Cape Cod, where they made brief stops at several residences and motels to meet with individuals. Based on my training and experience, I believe these brief meetings, whether in public areas or at residences, were consistent with "street" or "retail" drug transactions.

23.     Prior to each purchase made by CS1, monitored text messages were sent to members of the ANTOINE DTO to place the heroin order. In addition, calls made and text messages sent by CW1 were monitored or recorded, and the controlled purchases made by CW1 were audio and video recorded. All calls placed by CS1 and CW1 were confirmed by toll records. After each order was placed, ANTOINE agreed on a time and location to meet to complete the purchase. Prior to each controlled purchase, CS1 or CW1 was given money to purchase heroin and searched for money or contraband. Investigators conducted surveillance for all eight controlled purchases. Subsequent to each buy, officers secured the heroin, searched and debriefed the purchaser. All of the drugs purchased field tested positive for opiates, and the drugs have been sent to either the DEA or MSP laboratories for confirmatory testing. In total,

10

approximately 120 grams of heroin were purchased. The controlled purchases are summarized below.

### *January-February 2015: Controlled purchases by CS1 from ANTOINE*

24.     As detailed herein, between January and February 2015, CS1 made four controlled purchases of heroin from the ANTOINE DTO. All of the purchases were preceded by monitored text messages placed by CS1 to a cellular phone ANTOINE previously used by ANTOINE. ANTOINE sent couriers to deliver the heroin to CS1 for the first two transactions, and delivered the heroin personally for the last two transactions. All of the purchases were surveilled by officers.

25.     On January 20, 2015, CS1 sent a monitored text message to ANTOINE to order a "quarter finger" (2.5 grams) of heroin from ANTOINE. During the text message exchange that ensued, ANTOINE agreed to sell CS1 the quarter finger of heroin and to meet CS1 at an agreed upon location. Later, officers conducting surveillance in the vicinity of the agreed upon location observed a black Nissan Altima, New York registration FJA6976, driven by an unidentified black male arrive at the location. CS1 met with the unidentified driver, who gave him the heroin in exchange for $150. A records check revealed that the Nissan Altima driven by the unidentified male was registered to Hertz Rental Company and had been rented by

Brockton, Massachusetts

(Target Location #1) .

26.     On January 23, 2015 at approximately 2:21 p.m., at the direction of law enforcement, CS1 sent a monitored text message to ANTOINE to order heroin. The text read, "Whats up I need a finger but I need it by 430 ok I have to leave my house by then ok." ANTOINE replied by text, agreeing to sell CS1 a finger of heroin. After the text message

11

exchange, officers observed two unidentified black males exit Target Location #1 and get into a green Honda CRV, bearing Massachusetts registration 4EM500. Law enforcement observed the same Honda CRV arrive at the meet location at approximately 3:55 p.m. The front seat passenger got out of the CRV, walked to the predetermined location, and returned to the CRV a minute later. Afterwards, CS1 told officers that he had purchased heroin from an unidentified "runner." Officers followed the Honda CRV back to 17 Foster Street and saw the two unidentified men enter Target Location #1.

27. On February 5, 2015, CS1 sent a monitored text message to ANTOINE, which read, "What's up I need a finger." ANTOINE agreed to sell CS1 a finger of heroin (10 grams). Following the text message exchange, officers observed a 2015 white KIA Forte, bearing Massachusetts registration 473XY1, arrive at Target Location #1. A records check revealed that this car was registered to Affordable Rentals and had been rented by ANTOINE. When the car arrived at 17 Foster Street, officers observed two black males exit the car and enter Target Location #1. A few minutes later, a black male with a dark blue hooded sweatshirt, later identified as ANTOINE, exited the apartment and got into the driver's side seat of the KIA Forte. Officers followed the KIA Forte to 175 Menlo Street, and observed ANTOINE enter the side door of the building. Later that day, the KIA Forte arrived at the prearranged location. Officers saw ANTOINE get out of the car and walk to meet with CS1. After the brief meeting, ANTOINE returned to the KIA Forte and drove away. Afterwards, CS1 gave the heroin he had purchased to officers and told them he had purchased it from "D."

28. On February 12, 2015, CS1 sent another monitored text message to ANTOINE to order heroin. The text message read, "I need a finger ok?" ANTOINE replied by text, agreeing to sell CS1 the finger of heroin, and to meet CS1 at an agreed upon location. Approximately two

12

and a half hours after the text message exchange, officers observed ANTOINE and Marshawn ▇ exiting Target Location #1. ANTOINE and ▇ got into a black KIA Sportage, bearing Massachusetts registration 474XY1, (hereinafter, the "KIA Sportage") and drove to the previously agreed upon location. A records check revealed that this vehicle was registered to Affordable Rentals in Whitman, Massachusetts, and had been rented by ANTOINE. Officers saw ▇ get out of the KIA Sportage and walk to the meet location where CS1 was waiting. Moments later, ▇ returned to the car and drove away.

**February-April 2015: Controlled purchases by CW1 from ANTOINE** ▇

29.     CW1 made four controlled purchases of heroin from the ANTOINE DTO between February and April 2015. All of the purchases were preceded by a monitored and/or recorded phone call or text message placed by CW1 to ANTOINE. ANTOINE sent couriers to deliver the heroin to CW1 on the first three occasions, and delivered it personally on the last occasion. All of the purchases were surveilled by officers.

30.     On February 24, 2015 at approximately 11:58 a.m., CW1 placed a consensually recorded call to ANTOINE. During the call, ANTOINE agreed to sell CW1 three fingers of heroin (30 grams) for $1,000. In a subsequent recorded call, ANTOINE confirmed he was on his way to CW1's residence. At approximately 12:15 p.m., officers watching 17 Foster Street saw the KIA Sportage rented by ANTOINE arrive at 17 Foster Street. At approximately 4:00 p.m., CW1 texted ▇ who confirmed he would be "leaving in 10 minutes." At approximately 4:28 p.m., officers observed a black male wearing a jacket with a fur hood, later identified as ▇ exit Target Location #1. An officer saw ▇ walk to a nearby gas station and get into the passenger seat of a gray Honda Civic, bearing Massachusetts registration

13

836ZW4 (hereinafter, the "Honda Civic"). At approximately 4:48 p.m. ▮▮▮▮ texted CW1, "I'm about to hop on highway now."

31.     Officers followed the Honda Civic to CW1's residence in Hyannis, where CW1 was waiting. CW1 audio and video recorded her meeting with ▮▮▮▮ inside the Honda Civic. The recording captured CW1 giving ▮▮▮▮ money, to which ▮▮▮▮ asked, "That's a rack?" CW1 replied, "Yup, thank you," and took the heroin from ▮▮▮▮ After the transaction, CW1 gave the heroin to officers and told them she had purchased it from ▮▮▮▮ who was wearing a fur hooded jacket. CW1 said there were two white males in the car with ▮▮▮▮ Later that evening, officers conducted a motor vehicle stop on the Honda Civic and identified the while male driving the car as ▮▮▮▮ and the passenger as ▮▮▮▮ A motor vehicle inquiry revealed that the gray Honda Civic was rented by ▮▮▮▮ mother. On March 5, 2015, CW1 was shown a Massachusetts RMV digital photograph of ▮▮▮▮, whom CW1 positively identified as the driver of the Honda Civic.

32.     On March 5, 2015, at approximately 1:34 p.m., CW1 placed a consensually recorded call to ANTOINE. CW1 asked ANTOINE if she could have "three for the thousand" (three fingers for $1,000) and ANTOINE agreed. Approximately an hour later, surveillance saw ANTOINE's KIA Sportage arrive at 175 Menlo Street, and a black male, believed to be ▮▮▮▮ get out the passenger side of the vehicle. At 3:36 p.m., CW1 placed another recorded call to ANTOINE. ANTOINE told CW1 that he was on his way. At 4:00 p.m., CW1 sent a text message to ▮▮▮▮ asking if he was coming to see her. ▮▮▮▮ affirmed in a reply text message. Approximately 10 minutes later, a pole camera captured the Honda Civic arrive at 175 Menlo Street. ▮▮▮▮ exited 175 Menlo Street and got into the passenger side of the Honda Civic.

14

33.     At 6:15 p.m., CW1 again called          in the presence of officers, and

informed CW1 that he was "three miles away."   When the Honda Civic arrived at the meet

location, CW1 got into the Honda Civic with          The conversation between          and

CW1 was audio and video recorded by CW1. While in the car,          handed CW1 something

and CW1 said "Uh, nope.  Three" (referring to the three fingers CW1 had ordered from

ANTOINE).          replied, "Oh.  He didn't tell me that," and urged CW1 to "just take the

eight" (referring to the two fingers).          repeated, "He didn't tell me.  I thought you only

needed two."  CW1 is seen on the video counting the money.  Later, CW1 gave officers the

audio and recording device and the two fingers of heroin she had purchased, returned the $200

that was not used, and identified          as the person who sold her the heroin.

34.     On March 20, 2015, at approximately 12:03 p.m., CW1 placed a consensually

recorded call to ANTOINE. CW1 told ANTOINE, "I got money that I owe you.  Plus I want to

grab three off you" (referring to three fingers of heroin).  ANTOINE asked, "So what you got?

Two?"  CW1 told ANTOINE she had "a thousand for the three and then the four I owe you."[2]

ANTOINE replied, "Oh yeah.  All right, all right.  I got you.  Call you right back."  At

approximately 1:10 p.m., CW1 placed a monitored and recorded call to          CW1 asked

          "Did you talk to D already?  'Cause I got like a bunch of stuff for him."

replied, "Yeah, he told me."

35.     Contemporaneous pole camera footage shows ANTOINE and          exiting

Target Location #1 around 12:22 p.m., after CW1's initial call to ANTOINE, and getting into

the KIA Sportage. At 1:00 p.m., the car stopped at 9 East Cottage Street in Dorchester, and then

returned to 17 Foster Street at 1:25 p.m., at which time ANTOINE and ▮▮▮ got out of the car and entered Target Location #1.

36.     Later that night, CW1 and ▮▮▮ exchanged a number of text messages about when ▮▮▮ would be arriving at CW1's residence. ▮▮▮ arrived at CW1's residence at approximately 11:28 p.m. Officers conducting surveillance observed a brown Mercury Sable, bearing Massachusetts registration 183BZ6, arrive near CW1's residence. CW1 got into the car, and audio and video recorded the meeting inside the car. After the transaction, CW1 met officers at a prearranged location and gave the heroin and recording device to officers. CW1 told officers that the diver of the sedan was a white female, whom CW1 recognized but did not know her name. CW1 further told officers that ▮▮▮ who was in the backseat with an unknown white female, had given her the heroin.

37.     On April 8, 2015, CW1 advised officers that she had spoken with ANTOINE, and that he had given her his new phone number, which CW1 provided to officers. That same day, CW1 placed a recorded call to ANTOINE. CW1 asked ANTOINE if he "could do three for that fourteen" (three fingers for $1400). ANTOINE replied, "What? You want three of them? I got you." At approximately 11:40 a.m., officers saw ANTOINE and ▮▮▮ leave 17 Foster Street in ANTOINE's KIA Sportage and followed them to CW1's residence. At approximately 12:54 p.m., CW1 received an incoming call from ▮▮▮ who told her that he and ANTOINE had arrived at her residence. This call was not recorded. After this call, CW1 walked outside her residence and got into the KIA Sportage. CW1 audio and video recorded her meeting with ANTOINE and ▮▮▮ inside the KIA Sportage. The video footage shows CW1 counting the money and handing it to ANTOINE, who asked "Fourteen?" The video further shows CW1 with the heroin in her hand. After the transaction, CW1 met with officers, and turned over the

16

recording devices and heroin, which she said ▮▮▮ had handed to her.  Surveillance officers followed the KIA Sportage back to 9 East Cottage Street, Dorchester, Massachusetts after the transaction.

### *Defendants ANTOINE,* ▮▮▮

October 20-22, 2015: ▮▮▮ sent a package of heroin to ANTOINE

38.     On October 20, 2015 at approximately 1:47 p.m., ANTOINE sent ▮▮▮ a text message, which read, "Orlando smith 121000358/002362570337 b of a."  At 2:16 p.m., ▮▮▮ called ANTOINE to confirm the number he had given her was the "account number."  ANOTINE confirmed that one number was the "routing" number and the other was the "bank account number."  At 2:23 p.m., ▮▮▮ called to confirm that she was sending "62 hundred."  ANTOINE told her to "make it 61."

39.     At 4:25 p.m., ▮▮▮ called ANTOINE and said, "You say you just put it in?  Or it's not in there?"  ANTOINE replied, "It's in there.  I put, I put 61 in there but she just right now put another 300.  So it's in there.  She transferred it from her account 'cause it was closed.  The bank's closed so she had to transfer the other 300."  I believe ANTOINE told ▮▮▮ that ▮▮▮ had transferred $6,100 to his bank account and transferred another $300 in a separate transaction.  ▮▮▮ asked ANTOINE about the "real raw shit" and if ANTOINE knew "how to do it."  ANTOINE asked, "You mean if I know how to do it?  If I know how to make it?  ▮▮▮ affirmed, and ANTOINE said, "I make that shit rock."  ▮▮▮ said, "No, I'm saying . . . when it comes straight from over from the other side . . . that raw gummy, that raw shit."  ANTOINE interrupted saying, "You can make one into five type shit."  ▮▮▮ told ANTOINE he had to know how to "do it."  ANTOINE asked, "Why?  'Cause its gonna drop a lot of people?"  ▮▮▮ said, "No, because its natural.  There's nothing on it.  It's just raw. . . .

17

You watch them Chinese, and they got on their feet and their teeth and all that . . . that brown gummy shit. . . You gotta know how to put it in the wave and get it thick blend it out to get it." ANTOINE said he did not know how to do that and told     he would be "stuck with that." I believe     was explaining to ANTOINE that he could get opium paste or raw heroin, and asked if ANTOINE knew how to process it into heroin. I further believe that ANTOINE admitted he did not know how to process it and did not want to be "stuck" with that type.

     confirmed again that ANTOINE had sent the remaining $300 and ANTOINE affirmed.

40. On October 21, 2015 at approximately 4:28 p.m., ANTOINE received a text message from     which read, "Younglionent@gmail.com."

41. At approximately 5:04 p.m., ANTOINE called     and said, "Yo, check the email. It's definitely in there. All you gotta do is accept it, and it goes right in. . . . You gotta either send the text or the thing. . . all you gotta do is press accept and you get the money."

     replied, "I'm gonna now. I just picked that shit up. That took all my little bread." ANTOINE said, "Yo, bro. I swear to god I got you my nigga. If you need it tomorrow type of shit."     said, "Nah. What happened, I was already short 'cause 'member when you sent that 61? I had to give my little man a little 200, so it was 49. So I had to make that up to next 500 on that, plus I took a next thing from my man. You know what I'm saying? . . I need money to go send this shit out right now." ANTOINE said, "Trust me. You gotta put me on."

     said, "So I did the foot work on it. My old school like that nigga you just seen he's old school like 40 years in the business. Man say it got a nice taste and everything. He was like, 'this got a nice taste and everything.' This is like an 8 and a half. You feel me?" ANTOINE asked, "So I can play with it?"     replied, "Yea. Don't tap it too much. Just put it out there to get back the people." I believe ANTOINE told     to check his email

18

(Younglionent@gmail.com.) to accept the money transfer; that ████ told ANTOINE he needed the money to pay his suppliers; that ████ told ANTOINE the heroin he had for ANTOINE was high quality ("Man say it got a nice taste and everything."); that ANTOINE asked if he could dilute it to increase his profits ("So I can play with it?") and that ████ told him not to dilute it too much so that the customers would like it ("Don't tap it too much. Just put it out there to get back the people.").

42.     On October 21, 2015 at approximately 6:24 p.m., ████ called ANTOINE and the call was intercepted over Target Telephone #2. ████ said, "What's up? Send me the thing." ANTOINE replied, "The address?" ████ said, "Make sure it's right this time." ANTOINE said, "I got you."

43.     At 6:26 p.m., ANTOINE sent ████ two text messages, which read "175 Menlo st in Brockton Massachusetts 02301" and "Regi love." At 6:37 p.m., ANTOINE sent ████ another text message that read, "Daqnya Johnson 3146 Washington street Jamaica plain 02130."

44.     At 7:22 p.m., ████ called ANTOINE. ████ said, "That's out the door, aight. . . . Man, you caught me just in time to switch the addresses 'cause I was right there already." ANTOINE replied, "Aite. Let me get that tracking number." ████ agreed. I believe ████ called ANTOINE to confirm that he had sent the heroin to the second address that ANTOINE had sent him ("you caught me just in time to switch the addresses").

45.     At 11:40 p.m., ████ sent ANTOINE a text message that read, "1z5W2E151393952170." At 11:47 p.m., ████ sent ANTOINE a text message that read, "1z5w2e151393952170." ANTOINE replied by text, "Glo bro." I believe ████ sent

and ANTOINE the confirmation number for the UPS Parcel that he had sent to ANTOINE.

46.    On October 22, 2015, DEA Supervisory Special Agent Robert Barrett went to the UPS office in Norwood, Massachusetts, and took custody of an Express Pad Pak, Next Day Air parcel, bearing tracking number 1Z5W2E151393952170, which is addressed to "Daqnya Johnson, 3146 Washington Street, Jamaica Plain, Massachusetts." The return address on the package is the "The UPS Store #4977, Ste 110, 645 W 9th St, Los Angeles, California." Above the store address is the name "Marcus Robinson" and the telephone number "(213) 292-8043," which is the phone          had used to contact ANTOINE.

47.    At approximately 8:45 a.m., on October 22, 2015, MSP Trooper G. Berlo and his K9, Mako, arrived at the UPS facility at 1045 University Avenue, Norwood, Massachusetts. Mako was recertified on May 26, 2015, in the detection of marijuana, cocaine, heroin, and methamphetamine. UPS Security Manager Investigator Robert Long escorted Trooper Berlo and Mako to an empty room which contained numerous wooden cabinets other file cabinets all around the walls. After Trooper Berlo exited the room to retrieve Mako, Trooper Rudolph placed the UPS Parcel in a randomly selected wooden cabinet. At approximately 9:05 a.m., while Mako was scanning the room he came upon the cabinet that contained the UPS Parcel. Mako immediately alerted on the package.

48.    On October 23, 2015, the Honorable David H. Hennessy, United States Magistrate Judge for the District of Massachusetts, signed a warrant authorizing the search of the UPS Parcel (15-mj-4405-DHH). Pursuant to the search warrant, investigators opened the UPS Parcel, which contained approximately 127 grams of a brownish substance that field tested positive for opiates.

20

## *Defendants ANTOINE and BONHEUR*

### ANTOINE and BONHEUR test heroin on prostitutes

49.    On October 11, 2015 at approximately 1:56 p.m. (3119), ANTOINE called (617) 459-7106 and spoke to an unknown male who was a drug customer to discuss the quality of drugs that ANTOINE had sold. About an hour later, UM7106 called ANTOINE back and reported that the new batch of heroin was high quality. UM7106 told ANTOINE, "That shit right there. . . . I'm at the spot right now. . . . My folks are out, waiting for them to come back, I ain't, give them the call yet and let them know what to do, but um, I'm gonna bring you that bread and I'm gonna try to bring you, um, bread for one, I want to know if, um, I can grab one and a whole one." ANTOINE said, "I got you." UM7106 continued, "I need some of this [inaudible] before this shit be gone. I need this. I'm about to put it out there too, so I'm gonna hit you back in a minute."

50.    Later that night at approximately 7:18 p.m., ANTOINE called BONHEUR and said, "Do me a favor. . . See that shit gave you right there, the four fings? . . . I need that tried out right now. Let these bitches try it right now my nig." BONHEUR replied, "Alright, alright." ANTOINE continued, "Like right now. We need to know what it's like." BONHEUR laughed. ANTOINE said, "I'm serious my nigga. Hit them with a grizzle. Hit them with a little grizzle. Be like, 'Yo what it's like?' Tell them it's some new shit. I need to know how fire it is." BONHEUR agreed.

51.    At approximately 7:34 p.m., BONHEUR called ANTOINE back to report the results. BONHEUR told ANTOINE, "Anybody told you about that shit yet?" ANOTINE said, "No. Why? What's up?" BONHEUR answered, "Yo, that shit is fire. . . . Like definitely better than the last shit. Yo, this is some fire." ANTOINE replied, "They said its some fire?"

21

BONHEUR affirmed. I believe ANTOINE directed BONHEUR to give the prostitutes who work for the ANTOINE DTO a gram of heroin ("hit them with a grizzle") to test the potency of the heroin that he was selling, and that BONHEUR called ANTOINE back to inform him that the heroin was high quality ("that shit is fire").

<u>BONHEUR and ANTOINE discuss drug debts</u>

52.     On October 12, 2015 at approximately 7:40 p.m., BONHEUR used Target Telephone #6 to call ANTOINE and the call was intercepted over Target Telephone #2. BONHEUR told ANTOINE, "Yeah, I spoke to these niggas. These niggas said they ain't gonna be done till tomorrow morning, but I got 18 right now and P got five for me." ANTOINE replied, "Oh word. . . So you got 23?" BONHEUR confirmed. ANTOINE said, "Check it. I got that nigga coming over there he want to grab some flavor, but I ain't got no whip. Ain't nobody over there with a whip. . . Where that bitch, upstairs? She upstairs?" BONHEUR replied, "She upstairs." ANTOINE said, "I'm gonna tell that bitch [inaudible] whip or something, come over here and grab this flavor." BONHEUR agreed. ANTOINE continued, "How many. Matter of fact, no. You ain't got no flavor over there like that." BONHEUR said, "No. Probably like seven grizzles." ANTOINE replied, "Seven. Let me see what's up. Let me see if the bitch's up. I'm going to hit you back." Based on the intercepted calls, I believe BONHEUR told ANTOINE he and ▮▮▮▮▮▮ ("P") had collected $2,300 in drug debts ("These niggas said they ain't gonna be done till tomorrow morning, but I got 18 right now and P got five for me."); that ANTOINE had a customer who wanted to purchase cocaine ("I got that nigga coming over there he want to grab some flavor"); that ANTOINE asked how much cocaine BONHEUR had with him ("You ain't got no flavor over there like that?"); that BONHEUR said he had about seven grams ("probably like seven grizzles"); and that ANTOINE

22

needed someone to pick up cocaine to deliver it to the customer.

> BONHEUR discussed collecting drug debts and the prostitution business with ANTOINE.

53.     On October 12, 2015 at approximately 2:41 p.m., BONHEUR called ANTOINE from Target Telephone #6 and the call was intercepted over Target Telephone #2. BONHEUR asked, "What good with you man?" ANTOINE replied, "Shit. You all right nigga. . . What's the word?" BONHEUR replied, "Fucking, um, bout to have like 25 in a few." ANTOINE said, "Oh all right. . . . It is right." ANTOINE asked, "What's up with these hos?" BONHEUR answered, "I'm saying, they working right now. Got, I'm getting two of them now." BONHEUR told ANTOINE that a female named "Alicia" had a "call coming." ANTOINE told BONHEUR to call him later. I believe, based on the investigation to date, that BONHEUR had collected money for ANTOINE ("bout to have like 25 in a few"); that the proceeds were from either the sale of drugs or sex trafficking; that ANTOINE asked if any of the women were prostituting at that time ("What's up with those hos?"); that BONHEUR was driving the females to their prostitution calls ("they working right now"; "I'm getting two of them now."); and that a female named Alicia had a pending prostitution call ("Alicia" had a "call coming").

### *Defendant* ▮▮▮ *and ANTOINE*

54.     On October 7, 2015 at approximately 2:25 p.m., ANTOINE used Target Telephone #2 to call ▮▮▮▮. The call was intercepted over Target Telephone #2. ▮▮▮▮ told ANTOINE, "We ready to go live." ANTOINE told ▮▮▮▮ "I'll tell you about the bitches when I get over there." ▮▮▮▮ said, "I bet." ANTOINE asked where they should meet, and ▮▮▮▮ said, "Probably, uh, close to the doll house or spot." ANTOINE agreed to meet ▮▮▮▮ "in a bit." A LexisNexis database search revealed that

23

Marvin Antoine is the registered owner of the Doll Haus Beauty Bar, located at 2075 Dorchester Avenue, Dorchester, Massachusetts (hereinafter, the "Doll Haus" or "2075 Dorchester Avenue"). I believe ▇▇▇▇ and ANTOINE planned to meet at the Doll Haus to talk about prostitutes (""I'll tell you about the bitches when I get over there.").

55.     Later that night at approximately 10:35 p.m., ANTOINE received a call over Target Telephone #2 from ▇▇▇▇ and the call was intercepted over Target Telephone #2. ANTOINE told ▇▇▇▇ "I got two bitches ready right now. Ready nigga. What's up?" ▇▇▇▇ replied, "Say word?" ANTOINE said, "Two bitches right now. Do you need it tonight?" ▇▇▇▇ replied, "I just might have to make that happen. Hold on. Hold on. I'm a set that up right now. They on deck? They local? They close?" ANOTINE said, "They at Michelle's crib right now. I already told you she had some bitches over there. They right here right now. I can make her bring 'em to your house right now to talk to you. They ready right now to come through to talk. I didn't even need to say anything. I'm like, 'Yo. Just go talk to this man.'" ▇▇▇▇ told ANTOINE he would call him back. I believe ANTOINE called ▇▇▇▇ who is also a pimp, to ask him if he needed some prostitutes to work for him ("Two bitches right now. Do you need it tonight") that ▇▇▇▇ asked if the prostitutes were in the area ("They on deck"; They close?"); that ANTOINE said they were at Michelle ▇▇▇▇ house ("They at Michelle's crib right now"); and that ANTOINE was offering to trade or sell the prostitutes to ▇▇▇▇ ("I can make her bring 'em to your house right now to talk to you. They ready right now to come through to talk.").

56.     A few minutes later, ▇▇▇▇ called ANTOINE back on Target Telephone #2 and the call was intercepted. ▇▇▇▇ told ANTOINE he wanted to meet in the morning at a "breakfast spot" to "chop it up." ▇▇▇▇ told ANTOINE he was glad ANTOINE "made

24

that link." ANTOINE replied, "Nigga there's like four bitches. They wanna go on a trip, nigga. How long they gotta go for, 'cause Michelle and all them wanna go. I already told you she was down, but Michelle ain't gonna have no [inaudible] but they trying to go deep. That's gonna make it smoother, but they trying go deep so they all will do something. If you want me to be real, like we get four bitches on shit on dogs."          replied, "I like your style. That's dope." ANTOINE continued, "Yep. They want a little vacation. I told them [inaudible] but they got they own money like the other bitches but whatever . . . But they ready to get on deck for niggas so what's up? Can we talk to this nigga about this dog food now? I got niggas four bitches my nigga. Can we do that?"          replied, "Yeah. We gonna do that. It would only be right. . . dope." ANTOINE replied, "Perfect time to do that right now, and I might even have that tomorrow for you."          said, "Dope. Dope. Let's shoot for like a late breakfast. Like 10:30." ANTOINE and          agreed to talk the following day. Based on these calls and subsequent calls detailed below, I believe ANTOINE and          were planning to send the prostitutes and          on a trip for the purposes of sex and/or drug trafficking ("They wanna go on a trip, nigga. How long they gotta go for, 'cause Michelle and all them wanna go."), and that ANTOINE and          agreed to meet the following day to discuss who would go on the trip ("Let's shoot for like a late breakfast.").

57.     After this call ended, ANTOINE used Target Telephone #2 to call          on (857) 210-9699, and the call was intercepted over Target Telephone #2.          answered, "Baby." ANTOINE said, "Yo. Niggas understood what I said, right? They want to have breakfast tomorrow morning."          replied, "Daddy, they understand it's tomorrow morning." In the background,          is heard asking people if they "understand" and said, "Whoever is coming has to come to breakfast meeting in the morning." ANTOINE said, "Nah,

25

nah. But here's what I'm trying to tell you. They want to have breakfast and try and talk to them though. They want to have a breakfast meeting."          said, "So, whoever's coming got to come to a breakfast meeting in the morning. Alright. Well, Chaley's out but there's like six girls in here. Alright."          was heard counting as she was talking to ANTOINE. ANTOINE asked, "Is it bouncing?"          replied, "No. Only one girl has a job. Nobody else has a job." ANTOINE replied, "Oh word. Alright." I believe          had at least six women who work as prostitutes for the ANTOINE DTO with her when she talked to ANTOINE ("there's like six girls in here"); that ANTOINE scheduled a meeting with the prostitutes about a possible sex and/or drug trafficking trip they were planning ("whoever's coming got to come to a breakfast meeting in the morning"); that ANTOINE asked if any of the prostitutes had scheduled appointments to meet with men for sex ("Is it bouncing?"); and that          told him that only one prostitute had a scheduled appointment ("No. Only one girl has a job.").

58.     On October 8, 2015, surveillance units went to the area of 2075 Dorchester Avenue. At approximately 6:00 p.m., approximately five males, including ANTOINE and          arrived in vehicles, and entered the front door to 2075 Dorchester Avenue. Shortly thereafter, two vehicles carrying a total of six females and two small children arrived. The six women and two children also entered 2075 Dorchester Avenue. At some point, the six women exited the building, huddled outside near the parking lot, and then returned inside the building together. Between 6:00 p.m. and 7:45 p.m., a number of drug calls were intercepted over Target Telephone #2 in which customers placed orders with ANTOINE and were directed to go to 2075 Dorchester Avenue to pick up their drugs. ANTOINE was seen coming out of the building a number of times to meet with people in what appeared to be drug transactions.

59.     At approximately 7:45 p.m., ANTOINE,          and the other men and

26

women exited 2075 Dorchester Avenue and departed in vehicles. Officers followed a white Land Rover bearing Massachusetts registration US72KE that was being driven by ▆▆▆▆▆ and conducted a motor vehicle stop near the University of Massachusetts Boston campus. ▆▆▆▆▆ was identified by his Massachusetts driver's license. The passenger in the car with ▆▆▆▆▆ was identified by a Florida driver's license as Marvin McKurdy, 2980 N.W. 43rd Terrace #201, Lauderdale Lakes, Florida.

60.    At approximately 8:33 p.m. that night and after the traffic stop, ▆▆▆▆▆ called ANTOINE, and the call was intercepted over Target Telephone #2. ▆▆▆▆▆ asked, "Yo bro. You good?" ANTOINE said he was and asked why. ▆▆▆▆▆ told ANTOINE, "I just got posted by the boys, yo. That seemed kind of sus. Talking about white SUV that had road rage, that matched my description, but they had to come check me out and shit real quick. I wasn't feeling that yo. . . That shit didn't make no sense bro. I'm over here by UMASS dog. I was on campus." ANTOINE asked, "They take you out of the car?" ▆▆▆▆▆ replied, "Nah. I ain't get out of the whip. I gave them my paperwork. I'm good. You know my face is clean out here, so they just looked at my man shit, and said, 'Oh yeah. I'm sorry about it, but you know we only pulled you guys over because you guys matched the car. You know a white SUV that had road rage that was cutting people off, and when we seen you pull into the campus, you know we figured we just look into it.'"

61.    ANTOINE replied, "Yo. Hold up, hold up. Who's that? D boys or regular police? ▆▆▆▆▆ answered, "D Boys. These niggas wasn't dressed yo. Regular niggas yo . . . but it was, uh, I thought it was UMASS Police but it wasn't. . . . I went to go see twin real quick after I left the shop, I went to twin's spot for a couple of minutes, and then from there I came to UMASS. So it's like. I don't think niggas was trailing me, but I don't know." ANTOINE

27

replied, "Nah, I don't think so. Especially with me. All them transactions I was just doing in there nigga, don't get me noted . . . I don't think it was anything crazy, but I'm at the crib right now. I'm at the spot."      replied, "You good. Alright, just checking in on you and shit. Making sure you got out." ANTOINE said, "Yeah, I'm cool. I'm counting bread right now. Trying to count. Trying to see what I got right now actually."      said he wanted to see ANTOINE in the morning. ANTOINE replied, "Yeah, no. We already know. See, with the bitches man, we getting money out here. You feel me my nigga? I got that done."      replied, "Yup. I like you style." ANTOINE said, "You already know my nigga."      said, "And then Michelle finessed that shit. . . . I love it. I love it. I love it. So we going to definitely to chop it up later though bro, I was just checking in what's good."

62.      I believe      called ANTOINE after he was stopped because he was suspicious about the reason he was stopped ("I just got posted by the boys, yo. That seemed kind of sus."); that ANTOINE told him not to be concerned because he had not been stopped even after making numerous drug transactions outside of the Doll Haus ("Especially with me. All them transactions I was just doing in there nigga, don't get me noted . . . I don't think it was anything crazy, but I'm at the crib right now. I'm at the spot."); that ANTOINE was counting money ("I'm counting bread right now."); that ANTOINE told      they were making money from the prostitutes ("With the bitches man, we getting money out here. You feel me my nigga? I got that done."); that      liked how      handles the prostitutes ("Michelle finessed that shit"); and that ANTOINE and      planned to meet to discuss the prostitution business ("So we going to definitely to chop it up later though bro").

63.      On the night of October 8, 2015, following the meet at the 2075 Dorchester Avenue, ANTOINE was observed on electronic surveillance, at approximately 8:14 p.m.,

28

arriving at 17 Foster Street and entering apartment #6 (Target Location #1).

<u>       travels to Mexico with criminal associates to purchase drugs.</u>

64.     On October 15, 2015,      and three other women,      flew to Mexico City directly from Boston Logan Airport. All four were scheduled to return to Boston on a direct flight from Mexico City on Sunday, October 18, 2015. On October 18, 2015,     and     z returned to the United States after rerouting their flight through Houston, Texas.    and    missed their return flight on Sunday and remain in Mexico. On October 18, 2015, investigators intercepted a number of calls between     ANTOINE,     and others, which explained that   and     were told to stay in Mexico until Thursday, and that they would be paid for their trip. Based on the following summarized calls, I believe     left   and   in Mexico because they were planning to smuggle drugs with them when they returned to the United States.

65.     On October 18, 2105 at approximately 10:52 a.m.,     called ANTOINE. ANTOINE told     the "girls" were getting nervous.     told ANTOINE that the girls should stay at the hotel to stay there for at least another hour and then "hop in an Uber to the other spot because check-in is at 3:00."     said things were not going "smooth" right now from what "twin" was telling him. ANTOINE told     the girls were complaining and nervous." I believe     twin brother,     ("twin") was organizing where the women were supposed to go to pick up drugs but that the women did not know where they were supposed to go.

66.     At approximately 12:58 p.m., ANTOINE called     said he had his "man on the other line." ANTOINE said the girls did not have a reservation at the

other place. ▆▆▆▆ said, "But that's information. They can't just pick up the phone and call. They have to go there, bro. They're all set. Their room's taken care of." ANTOINE replied, "All right. That's what I'm saying, all he had to do was tell them that, dawg." ANTOINE said he would notify the women. Immediately after hanging up, ANTOINE called (617) 396-6807 and spoke with a female who referred to herself as ▆▆▆." I believe this is ▆▆▆▆ ANTOINE tells ▆▆ they are "all good" and they can "just go there because there's people who work there and all they have to do is give them their name." ▆▆ agreed and told ANTOINE they would take Uber to the place.

67.    At approximately 1:17 p.m., ▆▆▆▆ called ANTOINE, and the call was intercepted over Target Telephone #2. ANTOINE told ▆▆▆▆ that the "girls" were complaining about having to stay in Mexico because they thought they were returning that day. ▆▆▆▆ then conferenced in another male, whose identity is unknown ("FNU LNU"), who spoke to ANTOINE. FNU LNU told ANTOINE it was not "part of the plan" for the girls to return that day. FNU LNU said the girls would remain in Mexico for four more days. ANTOINE told FNU LNU he had other girls "waiting and ready to go now." FNU LNU told ANTOINE he need to "understand" how the business works and the girls need to "chill" and follow instructions. FNU LNU told ANTOINE the girls should not have been in "Mexico City" but rather they needed to be where they were now. ANTOINE said that "▆▆▆▆" would be leaving and the girls did not feel comfortable without her, and that they needed more "bread." FNU LNU said he would "cover that" when he met them in two days.

68.    ANTOINE told FNU LNU to keep the girls "calm." ▆▆▆▆ then told ANOTINE to keep calm. ANOTINE said he would call the girls. FNU LNU told ▆▆▆▆ to stay in contact with him. I believe ANTOINE told ▆▆▆▆ that the two women who

were staying in Mexico were complaining because they thought they would be returning that same day; that the girls were concerned about staying when          was leaving ("Michelle" was leaving); that ANTOINE had other women ready to make the same trip to Mexico; and that FNU LNU told ANTOINE the women would have to stay in Mexico for four more days before returning to the United States. As explained above, I believe the women will be transporting drugs back to the United States when they return.

69.      Later, at approximately 1:44 p.m., ANTOINE used Target Telephone #2 to call (617) 396-6807 and spoke to a woman referred to as          I believe "     " is          ANTOINE told          he thought they would be returning that day (Sunday), but the plan had changed. ANTOINE said, "He wants y'all to fall back right there for the night and then y'all gonna go to the other spot 'til Thursday. And Thursday nigga's at it. He wants y'all to fall back for three more days." ANTOINE told          someone would provide them with "bread" since they were staying longer.          asked, "So how much are we supposed to be getting paid each?" ANTOINE replied, "That's what I was telling you. Y'all about to get 75 each. Seventy-five hundred each is what I'm [inaudible]. You know what I mean? 'Cause right now they working on. They talking trying to be able to. I'm a hit y'all niggas with something too, though, like, I'm a make sure y'all good though, real talk. 'Cause y'all doing some real G shit for me right now. Like I'm talking about all this extra weight and. Everything's official."          agreed. ANTOINE said he wanted them to be "comfortable" and told          "The nigga knows what he doing. That's why he moves like that." I believe          and Daqnya Johnson were told to remain in Mexico after          and          returned; that someone in Mexico was planning to meet them to give them drugs, which they would then transport back to the United States; and that          and Johnson would be paid $7,500 each to transport the drugs back to the

31

United States.

70.     On October 19, 2015 at approximately 9:51 a.m., ANTOINE called ▊▊▊▊▊▊
The call was intercepted over Target Telephone #2. ▊▊▊▊▊ told ANTOINE "You know
they're making moves today to go to the other spot." ANTOINE acknowledged. ▊▊▊▊▊
said it would cost "like ten bucks for them to hop on the bus and make that move." ▊▊▊▊▊
told ANTOINE the trip from "point A to point B" was only a couple of hours. ANTOINE asked
▊▊▊▊▊▊▊ to text him the address to the "Astro Hotel." ▊▊▊▊▊▊ replied, "Astros in
Tijuana. They got to be in Tijuana. They're in Mexico City where all the fun is. Where the
vacation is . . but the vacation's done. . . They got to go to the spot and the spot's in TJ."
ANTOINE agreed. ▊▊▊▊▊▊ warned ANTOINE, "So once they get over there they just sit
and chill. . . My man specifically stated, 'Yo, Do not have them blow trees in the room. He
doesn't want trees on their clothes. The scent of it on their clothes. He doesn't want it on their
luggage. He doesn't want it on their fingertips whey they're traveling. . . . That's all enough to
get red flagged and stopped." ANTOINE told ▊▊▊▊▊ that ▊▊▊▊▊ " said going through
"Texas was crazy." ▊▊▊▊▊▊ said, "We're going to prevent that from happening, yo, because
they're going another route. . . . It's gonna be smooth. . . . We just don't want that to be
interrupted by anything on their end . . . like them coming through smelling like blunted and
shit." ANTOINE said he would tell them not to smoke. I believe ▊▊▊▊▊ told ANTOINE
that ▊▊▊ and ▊▊▊ had to travel to Tijuana to pick up the drugs they planned to bring back
to the United States ("They got to be in Tijuana. They're in Mexico City where all the fun is.
Where the vacation is . . but the vacation's done"); that ▊▊▊▊▊▊ associate in Mexico
warned that they should not smoke marijuana because that would alert law enforcement ("He
doesn't want it on their fingertips whey they're traveling. . . . That's all enough to get red

32

flagged and stopped."); that they were not going to be reentering through Texas ("they're going another route.").

71.     Following this call, investigators intercepted numerous calls over Target Telephone #2 between ANTOINE and ███████ and ANTOINE and ███████ After realizing that the bus ride from Mexico City to Tijuana was approximately 30 hours, ANTOINE told ███████ the women were going to book a flight to Tijuana.

72.     At approximately 2:03 p.m., ANTOINE called ███████ and told him that ███████ and Johnson had been stopped by the Mexican police when they arrived at the airport to take their flight to Tijuana. ANTOINE said the police asked ███████ and ███████ why they had not flown back to the United States as scheduled with the other two women and why were they going to Tijuana. ANTOINE said, "Them bitches is cancelled. I don't want to fuck with them." ███████ said, "That's a lot of time and energy wasted right now. . . . They shouldn't have booked that trip together . . . with them two bitches bro . . . out of four and only two leave . . . two stay behind." ANTOINE complained that the person in Mexico who planned the trip should have anticipated that this would happen. ANTOINE said he did not want to "use them no more" because "they gonna search the fuck out of them when they come out of Tijuana." ███████ agreed, "They hot right now." ANTOINE told ███████ "Call that nigga though man. Let him know what's up man." ███████ said he would "hit him up." ANTOINE continued to complain about how the trip was planned and ███████ agreed, saying "Yeah. We shouldn't em to Mexico. We should have fucking sent them to fucking Cali nigga. Then from Cali they took the bus in." ANTOINE agreed. ███████ continued, "They making way to many moves down there in Mexico, and that shit's only gonna track shit in nigga's cribs . . . they picked up on it like they know what it is out there in Mexico and shit. With mules and

33

shit." ANTOINE and ▮▮▮▮▮ agreed to meet. I believe ANTOINE was concerned about having ▮▮ and ▮▮ continue to Tijuana to pick up drugs because the police had questioned the purpose of their trip ("they gonna search the fuck out of them when they come out of Tijuana."); that ▮▮▮▮▮ agreed they should have sent the women to California first and then to Tijuana ("We should have fucking sent them to fucking Cali nigga. Then from Cali they took the bus in."); and that the Mexican police knew the women were planning to transport drugs back to the United States ("They making way to many moves down there in Mexico, and that shit's only gonna track shit in nigga's cribs . . . they picked up on it like they know what it is out there in Mexico and shit. With mules and shit.").

73.     Later that same day at approximately 6:56 p.m., ▮▮▮▮▮ called ANTOINE, and the call was intercepted over Target Telephone #2. ▮▮▮▮▮ asked where the women were and ANTOINE said he "made them come back." ▮▮▮▮▮ agreed that was "probably the best thing." ▮▮▮▮▮ said his "man" was trying to "figure out right now." ▮▮▮▮▮ told ANTOINE, "He is getting somebody else down there for Saturday asap to come back through with it, yo. I ain't trying to play the blame game on nobody . . . We shouldn't have sent so many down at one time. That's what made it hot. . . We have to figure out how to get you compensated so you don't take a hit on that trip and shit." ANTOINE agreed. ▮▮▮▮▮ said he was "looking out for probably sometime maybe this weekend." ANTOINE replied, "Word." ▮▮▮▮▮ said it depended on if "he does find someone on a timely fashion." ANTOINE said, "I got some other mother fuckers too!" ANTOINE told ▮▮▮▮▮ "Your brother is on his way over here right now." ANTOINE and ▮▮▮▮▮ agreed to meet later. I believe ▮▮▮▮▮ was arranging to have someone else bring drugs from Mexico ("He is getting somebody else down there for Saturday asap to come back through with it"); that they should

34

not have sent all four women down to Mexico together ("We shouldn't have sent so many down at one time. That's what made it hot"); that ▇▇▇ thought he should get the drugs by that weekend; and that he planned to give some drugs to ANTOINE because he had paid for the trip to Mexico ("We have to figure out how to get you compensated so you don't take a hit on that trip and shit.").

ANTOINE sent marijuana to Target Locations #2 and #4

74.     On October 22, 2015 at approximately 12:57 p.m., ▇▇▇ called ANTOINE and the call was intercepted over Target Telephone #3. ▇▇▇ told ANTOINE, "My pack got the personal in it. She threw it for nigga. She threw nigga the extra QT. So niggas can . . . put that in the air. You feel me?" ▇▇▇ told ANTOINE, "Listen, I'll throw you like . . . half of that. Two ropes off that for personal." ANTOINE said, "That's real." ▇▇▇ continued, "Yeah. Me and twinie keep a rope each . . . so we can do our own thing." ANTOINE replied, "Exactly. That's real." ▇▇▇ told ANTOINE he liked to smoke "designer" and that the "quality" his "men are getting" was "official." ANTOINE told ▇▇▇ he would call him later because he "got another jizzie for you anyway." I believe ▇▇▇ arranged to have packages of marijuana sent to Massachusetts; that the supplier sent an extra quarter pound, which he planned to share with ANTOINE and ▇▇▇ ("She threw nigga the extra QT"; "Me and twinie keep a rope each . . . so we can do our own thing."); that ▇▇▇ believed the marijuana was high quality ("quality" his "men are getting" was "official."); and that ANTOINE told ▇▇▇ he would call him back from a new phone number ("got another jizzie for you anyway." ).

75.     Later at approximately 1:53 p.m., ▇▇▇ called ANTOINE and the call was intercepted over Target Telephone #3. ▇▇▇ said he had gotten "two boxes." ANTOINE

said, "Everyone was supposed to get two boxes and one of the spots only got one box."

███████ replied, "Cause there's supposed to be a total of twenty." ANTOINE said he would

call to check about his missing box. ███████ told ANTOINE, "Let me track it right now and

see what the word is." ███████ said he would check "Rivers Street" and the "Rosi." A few

minutes later, ███████ called ANTOINE back. ███████ said, "The one that's going to . .

. the BMs crib in HP. That one's en route. . . . The other one ain't leave the spot. . . It still

saying Cali." ANTOINE said he was waiting for "HP." ███████ told ANTOINE, "I got my

two boxes at my crib." I believe ███████ told ANTOINE that a total of 20 boxes of

marijuana had been shipped from California ("Cause there's supposed to be a total of twenty.";

"It still saying Cali."); that ███████ received two boxes ("I got my two boxes at my crib.");

and that ███████ tracked the package that was being sent to ███████ house in

Hyde Park ("the BMs crib in HP") .

76.    After intercepting these calls, investigators contacted United States Postal

Inspector ("USPI") Stephen Dowd for assistance in locating these packages. USPI Dowd

identified 10 Priority Mail parcels that were mailed on October 20, 2015, at the Willow Creek,

California Post Office 95573. All ten parcels were destined for five different addresses in

greater Boston, Massachusetts. The parcels were all mailed at the same time to the following

addresses: 1) 655 River Street, Hyde Park, MA 02136 ███████ ); 2) 175

Menlo Street, Brockton, MA 02301 (ANTOINE's drug and gun storage location); 3) 48 Colberg

Avenue, Roslindale, MA 02131 (William FLEUIRMONT's residence); 4) 173 Porter Street,

Stoughton, MA 02072 ███████ ███████ ███████ and 8 Silloway

Street, Dorchester, MA 02124 (believed to be the residence of ███████

77.    USPI Dowd contacted the Willow Creek, California Post Office and learned that

Post Office Box ("POB") 603 was a valid address. USPI Dowd spoke with an employee who advised that POB 603 listed the names of Shane Chambers, Rikkie Chambers, Josh Moyes, Shane Flora and Front Porch Pretties. The employee further advised that the owners of POB 603 mail numerous packages all around the country to many addresses.

78.     On October 22, 2015 at approximately 4:42 p.m.,        called ANTOINE to discuss the package of marijuana that        and ANTOINE had sent to her address. The call was intercepted over Target Telephone #3.      told ANTOINE, "That shit didn't come. The mailman came, and that shit's not with it. . . . The same thing's online. I've been sitting on this fucking porch all fucking day." ANTOINE asked, "What it say online?"      replied, "It's saying the same shit departed from Boston. That's it. No more information, since 8:00 this morning." ANTOINE told      to "call that shit."      asked, "Who did you put it under?" ANTOINE replied, "You. This was under you."      replied, "In my fucking name! Of course it never fucking came." I believe      called ANTOINE to report that the box containing marijuana had not been delivered ("The mailman came, and that shit's not with it."); that the tracking information had not been updated ("No more information, since 8:00 this morning."); and that she was angry that ANTOINE addressed the box using her name because the box contained drugs ("In my fucking name! Of course it never fucking came.").

79.     All of the parcels were delivered under normal circumstances, except for the two parcels addressed to      and one parcel that was addressed to       . After a MSP canine trained in the detection of narcotics alerted on the boxes addressed to      investigators delivered one of the boxes addressed to      The second parcel addressed to      was seized. Pursuant to a federal search warrant, investigators opened the seized box,

which contained approximately two and one-half pounds of marijuana.

### Drug courier is arrested after leaving Target Location #2

80.    On November 19, 2015, agents intercepted a series of calls between BONHEUR and ███████████. Based on intercepted calls and the investigation to date, agents believe that Holzworth re-distributes heroin to customers of the ANTOINE DTO who reside on Cape Cod. During the calls, BONHEUR told Holzworth that someone would be delivering heroin to him. Agents observed a man later identified as Curtis Manchuck, arrive at Target Location #2. BONHEUR was observed leaving Target Location #2, and investigators saw BONHEUR meet with Manchuck on Myrtle Street, which is one to two blocks away, for a brief meeting which was consistent with a drug transaction. Officers followed Manchuck as he drove toward Cape Cod. Officers conducted a motor vehicle stop and recovered approximately 50 grams of heroin from Manchuck. In subsequent calls between BONHEUR and Holzworth, the two men talked about what had happened to Manchuck and whether he had been "booked."

### Target Subject ████████ is arrested with heroin

81.    On November 19, 2015 at approximately 7:27 p.m., ANTOINE called ████████. ANTOINE asked, "What's it looking like tonight? I need some bread." ████████ replied, "I'm gonna have hit G, cause G was going to go to the Cape to see a couple people, and I got to hit up my other mans out there." ANTOINE asked, "So it's like a two bands or more night though?" ████████ said it was going to be "a little less than that." Agents believe ANTOINE asked if ████████ had collected drug debts from customers; that ████████ told ANTOINE he and "G" were going to collect money from drug customers on Cape Cod; and that ████████ thought he would collect less than $2,000 from the drug customers ("two band night.")

82.    On November 20, 2015 at approximately 2:03 p.m.,                    called
BONHEUR and asked if BONHEUR was at the "triz" (175 Menlo Street).  BONHEUR
affirmed.              asked if BONHEUR was "going to the Cape" and BONHEUR replied
that he had to go later to pick up some "bread."              asked if BONHEUR could take "G"
with him "to meet this finger play."  BONHEUR told              he would not be going until
later that afternoon.

83.    On November 21, 2015, Yarmouth officers conducted a motor vehicle stop on an
Acura, which was being driven by              "G," who was identified as
was a passenger in the car.  The Acura was registered to Michelle              mother.  Officers
recovered approximately 10 grams of heroin from the car.              had approximately
$2,200 in his possession at the time of the stop.  Officers retrieved three cell phones from the car.
During the stop,                    a criminal associate of BONHEUR's, called BONHEUR
to tell him that              and "G" had been stopped.  Walker's bail was set at $40, and
              was held on a $5,000 bond.  Subsequent to the arrest, agents intercepted BONHEUR
calling ANTOINE to inform him about the arrest.  BONHEUR told ANTOINE he would wait to
see if PHANORD's bail would be reduced before posting his bond.

Robbery at Target Location #2

84.    On November 22, 2015 at approximately 9:26 p.m., BONHEUR received a call
from (774) 204-4509 and spoke with                    , who is a prostitute who works for the
ANTOINE DTO.  Foster told BONHEUR, "Someone's here. Here with a gun. . . Somebody is in
here with a gun. With whoever you left here."              r told BONHEUR the person had a "mask
on" and had a "gun to the girl."  BONHEUR asked who the person was and Foster said she did

39

not know. Foster told BONHEUR, "I just came out of my room and saw her getting her hair pulled with a gun."

85. At approximately 9:31 p.m., BONHEUR called ANTOINE and told him, "Some shit just went down at the triz. . . . Some nigga came in with uh, with a blick and put the tone to the bitches head nigga. . . . Nigga was asking her where the shit was at." ANTOINE asked, "And they didn't find it right?" BONHEUR replied, "No. They didn't find it. All they found was a tone. . . . the 30."

86. Later at approximately 9:59 p.m., ANTOINE called (339) 364-9327 and spoke with an unidentified male ("UM9327") about the incident. ANTOINE told UM9327 that a man named Deon had just "came through with a blick and took a blick from the trap."

87. After this call, investigators observed ANTOINE and BONHEUR at Target Location #1. After leaving Target Location #1, ANTOINE and BONHEUR were observed at Target Location #2. After leaving Target Location #2, officers conducted a motor vehicle stop on the car being driven by ANTOINE. Officers recovered a small amount of heroin and marijuana from the car. BONHEUR and ANTOINE were arrested and are held pending the charges sought in the federal complaint.

## III. Target Locations

### A. Drug Traffickers' Use of Residences Generally

88. Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences. I have participated in the execution of numerous search

40

warrants of the residences of drug traffickers whose criminal activity is similar to that of the Defendants. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug related evidence has typically been recovered including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

      a. Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

      b. Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

41

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c. It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d. It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to

obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e. Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f. Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g. Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h. Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

43

     i.    Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

     89.    In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Indeed, as noted above, investigators have intercepted ANTOINE, BONHEUR,　　　　　　　and　　　　　　using several cellular phones during the course of this investigation. A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet. Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

90.     Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe the Defendants, like many drug traffickers, use their residences in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Locations. *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

---

[3]  In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)). As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

## B.   *Description and Criminal Activity at Target Locations*

### (1)**ANTOINE's Residence – Target Location #1**

#### Description of Target Location #1

91.    17 Foster Street, apartment #6, which is more particularly described as a two story, residential condominium, facing southerly, which is covered in tan colored vinyl siding with dark green shutters. There is a stairway and landing leading to the front entrance door. The number "6" is in black colored block letters, to the left of a green colored storm door, which leads to a dark green colored entry door. This is the door which we seek access. A detailed description appears in Attachment A-1, which is attached hereto and incorporated herein by reference.

#### Link to Criminal Activity

92.    On numerous occasions throughout this investigation, investigators have seen ANTOINE leaving Target Location #1 prior to meeting customers who have ordered heroin, and returning to Target Location #1 after dealing drugs and collecting drug proceeds. As detailed above, ANTOINE returned to Target Location #1 on October 8, 2015 after meeting with

and others at Target Location #3 to set up a trip to Mexico. Earlier in the investigation, investigators saw ANTOINE leaving Target Location #1 after agreeing to sell CS1 and CW1 heroin. As recently as November 22, 2015, investigators saw ANTOINE and BONHEUR go to Target Location #1 after they learned that a person had robbed Target Location #2 and stolen a firearm. After leaving Target Location #1, ANTOINE and BONHEUR went to Target Location #2.

93.    Additionally, on October 9, 2015 at approximately 6:25 a.m., ANTOINE used Target Telephone #2 to send a text message to                    (over                    ) that read,

46

"Yo fkk with me on dis white shht."  A minute later, ANTOINE sent

three text messages, which read, "fireeee"; "U gt anything???"; "A tray or 7."  A few

minutes later,          sent ANTOINE a reply text that read, "Let me hold two of them shits i

got u."  ANTOINE then sent          a text asking "U want it cheffed."          replied,

"Na."  Later that day at approximately 7:47 p.m., after exchanging several more text messages,

ANTOINE called          and said, "Yea. I am at the spot you can come through."

agreed.  Approximately two minutes after this last call, investigators observed from pole camera

footage a heavy set, dark-skinned male walk through the parking lot and knock on the door of

Target Location #1. The male, believed to be          walked inside and then exited less than

a foot later on foot.  MARTIN's residence is located across the parking lot from ANTOINE's

residence (Target Location #1). Based on my involvement in this investigation and prior

intercepted calls, I believe ANTOINE asked          if he wanted to purchase cocaine ("Yo

fkk with me on dis white shht"); that ANTOINE told          the cocaine was potent

("fireeee"); that          acknowledge he wanted to purchase some cocaine ("Let me hold two

of them"); that ANTOINE asked if          wanted it in powder form or prepared as crack

cocaine ("U want it cheffed"); and that          replied he wanted the powder cocaine ("Na.").

94.     I therefore believe that there is probable cause to believe that evidence of his

ongoing drug trafficking offenses, as set forth in Attachment B, will be found at Target Location

#1.

### (2)     175 Menlo Street – Target Location #2

#### Description of Target Location #2

95.     175 Menlo Street, Brockton, is a two family dwelling. The exterior is light blue

in color with white trim. At the front of the residence there are a set of stairs which leads to front

door of the dwelling. To the right side of the residence there is a paved driveway. This residence is located on Menlo Street across from the Longwood Avenue. At the rear of this driveway there are a set of stairs which lead to a side door entryway. This doorway leads into a common hallway. The first floor apartment door is to the left in the hallway and the basement door is adjacent to the first floor apartment door to the right. The basement is not an apartment, and it is believed, based on intercepted calls, that the first floor apartment has access to the basement. Based on intercepted calls, ANTOINE is believed to rent the first floor apartment from Gina Marie Best, who is the property owner and second-floor tenant. Investigators have intercepted calls between Best and ANTOINE indicating that ANTOINE rents the first floor apartment from Best. A detailed description appears in Attachment A-2, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

96. As detailed above, ANTOINE, BONHEUR and others refer to Target Location #2 as the "trizy" or the "trap." As detailed above, on November 22, 2015 at approximately 9:31 p.m., BONHEUR called ANTOINE and told him, "Some shit just went down at the triz. . . . Some nigga came in with uh, with a blick and put the tone to the bitches head nigga. . . . Nigga was asking her where the shit was at." ANTOINE asked, "And they didn't find it right?" BONHEUR replied, "No. They didn't find it. All they found was a tone. . . . the 30."

97. Later at approximately 9:59 p.m., ANTOINE called (339) 364-9327 and spoke with an unidentified male ("UM9327") about the incident. ANTOINE told UM9327 that a man named Deon had just "came through with a blick and took a blick from the trap."

98.     After this call, investigators observed ANTOINE and BONHEUR at Target Location #1. After leaving Target Location #1, ANTOINE and BONHEUR were observed at Target Location #2. After leaving Target Location #2, officers conducted a motor vehicle stop on the car being driven by ANTOINE. Officers recovered a small amount of heroin and marijuana from the car.

99.     In addition, investigators have intercepted calls in which ANTOINE told BONHEUR to store a firearm in the basement of Target Location #2

September 30, 2015: ANTOINE arranged the sale of a firearm.

100.    On September 30, 2015 starting at approximately 4:17 a.m. and ending at approximately 4:53 a.m., Target Telephone #2 received approximately ten incoming calls from (508) 345-8723. None of the calls was recorded because Target Telephone #2 was not being monitored when the calls were placed. At approximately 8:17 a.m., Target Telephone #2 placed a call to (508) 345-8723 but the call was not answered. Immediately thereafter, ANTOINE used Target Telephone #2 to call (978) 201-8480 and spoke with            ANTOINE asked, "Yo, cool this nigga's knocked out?"            replied, "No. He's right here. His phone's in the car."            gave his phone to BONHEUR. BONHEUR asked, "Yo. What's the word?" ANTOINE said, "Yeah. You're falling back, man. That shit's a Reynolds." ANTOINE told BONHEUR, "Yo. Put that 40 in the basement where we used to snatch that jump off." BONHEUR replied, "Uh, I already [inaudible]." ANTOINE interrupted him saying, "Oh. All right. Word, word. Yo, make sure she's millie too. I'm going to take a look when I see you. Make sure these bitches are quiet, 'cause this is a Reynolds for nigga." BONHEUR replied, "Already done."

101.    Based on my training and experience, my conversations with other investigators, and the investigation to date, I believe "Reynolds" is used as a reference for Reynolds Wrap, and that the Target Subjects use the word "Reynolds" to refer to something that is done (wrapped up) or finished.  I further believe ANTOINE was referring to a person who had been recently murdered in the Hyde Park area of Boston ("that shit's a Reynolds"; "make sure these bitches are quiet, cause this is a Reynolds for nigga"), and, as explained below, that the gun BONHEUR had in his possession ("that 40") was used in the homicide.    I further believe ANTOINE called PHANORD's phone looking for BONHEUR ("this nigga's knocked out?"); that  told ANTOINE he was with BONHEUR and that BONHEUR's phone was in his car ("No. He's right here. His phone's in the car."); that ANTOINE told BONHEUR to put a gun in the basement ("Yo. Put that 40 in the basement") where they stored heroin ("where we used to snatch that jump off"); and that BONHEUR told ANTOINE he already placed it in the basement ("I already").

102.    Later that day, ANTOINE was intercepted over Target Telephone #2 negotiating the sale of a firearm.  placed a call to (617) 208-9803 and spoke with  ANTOINE asked, "What's popping with you?"  replied, "Ain't shit good. What's the word?" ANTOINE replied, "Ain't shit. You still got niggas trying to grab a, um, a jump off right? A tone? . . . Niggas still trying grab a tone, right?"  replied, "Yeah."  ANTOINE said, "Tell them my niggas got something sexy on the market for like nine.  With the, with the, with the beam and shit."  said, "Oh word?"  ANTOINE explained that the "battery is dead on the beam though."  said that was not a problem, and asked, "What number is it?" ANTOINE replied, "Neenska."  said he would make a call. Agents believe ANTOINE asked  if  knew anyone who wanted to purchase a gun ("You still got niggas . .

50

. trying grab a tone, right?"); and that ANTOINE had a 9 mm gun to sell for $900 ("Tell them my niggas got something sexy on the market for like nine"; "Neenska").

103.    At approximately 7:04 p.m.,         called ANTOINE over Target Telephone #2, and told him that a "dude" had "eight right now."         said, "Yeah. He got eight right now, but I told him." ANTOINE cut him off, and said, "I might do it."         said, "It's up to you. . . . I told him I need the nine though, he was like I'll do it for eight [in audible] I'll come to Brockton 850 or something." ANTOINE replied, "I'm saying, tell him to come to Brockton, and you'll give him to for eight but he has to come to Brockton to get it."         said he would "make the call." I believe         told ANTOINE that he knew a person who would purchase the gun for $800 (the "dude" has "eight right now"); that         said he told the person the price was $900 or $850 ("I told him I need the nine though"; "I'll come to Brockton 850 or something"); and that ANTOINE agreed to sell the gun for $800 if the person drove to Brockton to pick it up ("give him to for eight"; "He has to come to Brockton to get it"). I believe ANTOINE was eager to sell the gun and did not want to drive anywhere with the gun, and thus agreed to sell it for a lower price if the person came to Brockton to purchase it.

104.    At approximately 9:18 p.m., ANTOINE called         from Target Telephone #2, and the call was intercepted over Target Telephone #2. ANTOINE asked, "Want me to text you the address?"         replied, "Yeah. Same one as always the Foster?" ANTOINE replied, "Nah. Menlo. 175."         replied, "175 Menlo?" ANTOINE affirmed.

105.    At approximately 9:31 p.m., ANTOINE used Target Telephone #2 to call         and the call was intercepted over Target Telephone #2. ANTOINE told         "Dude's on his way right now to grab the tone."         replied, "Yeah. I'm going to call this nigga 'cause I'm not with him." ANTOINE asked         "What number

he got?   Text me that number he's at."   Immediately after this call, ▮▮▮▮▮ texted
ANTOINE the phone number "7742257921."   At approximately 9:35 p.m., ANTOINE used
Target Telephone #2 to call (774) 225-7921, and spoke with BONHEUR. An unknown female
answered the phone, and ANTOINE said, "This is D. Let me talk to Boog." BONHEUR got on
the phone and ANTOINE told him, "Someone is on their way right now to come grab that
(inaudible). He's gonna have 800." BONHEUR acknowledged. I believe ANTOINE called
▮▮▮▮▮ to tell him someone was going to 175 Menlo Street to purchase the gun ("dude's on
his way right now to grab the tone"); that ▮▮▮▮▮ told ANTOINE he was not home but
would call BONHEUR ("I'm not with him"); that ▮▮▮▮▮ texted ANTOINE BONHEUR's
new phone number ("7742257921"); and that ANTOINE contacted BONHEUR to tell him that
someone was going to purchase the gun for $800 ("Someone is on their way . . . he's gonna have
800.").

106.   At approximately 10:50 p.m., ▮▮▮▮▮ called ANTOINE, and the call was
intercepted over Target Telephone #2. ▮▮▮▮▮ told ANTOINE, "He's out there." ANTIONE
ended that call and called (774) 225-7921 to speak to BONHEUR. ANTOINE told the woman
who answered the phone he needed to speak to "Boog." When BONHEUR got on the phone,
ANTOINE told him, "Nigga's outside." BONHEUR asked, "You want him to come in or me go
out there?" ANTOINE told BONHEUR to "go out and see him" because "he don't need to see
you and all that shit." ANTOINE told BONHEUR, "Have [a] fitty on [inaudible]. If you don't
have a fitty on, don't let him get a good look at your mug and shit." BONHEUR agreed.
ANTOINE continued, "He's cool and shit. It's not even like that. I'm just saying you know?"
ANTOINE told BONHEUR to "just sling him that" and "make sure it's 800." BONHEUR
confirmed. I believe ▮▮▮▮▮ called ANTOINE to tell him that the gun purchaser had arrived at

175 Menlo Street; that ANTOINE directed BONHEUR to sell the gun outside the house ("go out and see him"); that ANTOINE told BONHEUR to wear a hat ("a fitty") so the purchaser would not be able to identify BONHEUR ("If you don't have a fitty on, don't let him get a good look at your mug and shit"); and that BONHEUR should confirm the purchaser paid him $800 for the gun ("make sure it's 800").

107.    At approximately 10:56 p.m. ANTOINE used Target Telephone #2 to call ▮▮▮▮▮▮ ANTOINE asked, "Yo. Where's this nigga at?" ▮▮▮▮▮▮ replied, "He said he was outside." ANTOINE told ▮▮▮▮▮ to tell the purchaser to "come in the driveway." ▮▮▮▮▮ said he would call the purchaser.

108.    At approximately 10:59 p.m., ▮▮▮▮▮ sent ANTOINE a text message, which was intercepted over Target Telephone #2, which read, "Hes at the door. Immediately after receiving this text message, ANTOINE called (774) 225-7921. An unknown female answered the phone, and ANTOINE asked, "Yo, where is Boog at?" The woman replied, ""He's outside." ANOTINE said, "Oh he did? 'Cause nigga says he at the door. Grab him up real quick." BONHEUR got on the phone, and ANTOINE told him, "Dude just told me that nigga at the door. Go check the front door." BONHEUR replied, "Yeah. I'm already there. I'm there with him."

109.    At approximately 11:05 p.m., BONHEUR used (774) 225-7921 to call Target Telephone #2 and spoke with ANTOINE. This call was intercepted over Target Telephone #2. BONHEUR told ANTOINE, "He wants some food too." ANOTINE asked if he wanted "dog food," and BONHEUR said, "No. Food for the uh." ANTOINE said, "Give him some. In the bag." BONHEUR told ANOTINE he "gave him that," but "he said he need more." ANTOINE replied, "We got him tomorrow then. Will meet him in the bean or whatever. We got him

Case 1:15-cr-10383-WGY   Document 10-1   Filed 11/23/15   Page 54 of 59

tomorrow." I believe BONHEUR called ANTOINE because the purchaser of the gun wanted ammunition for the gun ("He wants some food too."); that ANTOINE directed BONHEUR to give the purchaser the ammunition that was at 175 Menlo Street ("Give him some. In the bag."); that BONHEUR had already given the purchaser the ammunition that was in the house ("He said he need more."); and that ANTOINE directed BONHEUR to tell the purchaser that they would deliver more ammunition to him the following day ("We got him tomorrow then.").

110.    At 11:10 p.m.,          sent a text message to ANTOINE over Target Telephone #2, which read, "Smooth?" ANTOINE sent a reply text from Target Telephone #2, which read, "Yea, glo." I believe          wrote to confirm the gun transaction had been completed without incident ("Smooth?") and that ANTOINE confirmed it was done ("glo").

111.    After intercepting these calls, surveillance units were sent to the area of 175 Menlo Street. At approximately 10:55 p.m. on September 30, 2015, officers saw a vehicle pull into the driveway of 175 Menlo Street. A male, later identified as                          , approached the side door to 175 Menlo Street. A few minutes later,          got back into his vehicle and drove away. Officers followed the vehicle and stopped it. Officers searched the vehicle based on the intercepted calls and recovered a 9 mm handgun and ammunition inside the trunk of the car.          admitted he had purchased the firearm for protection, but would not say where or from whom he purchased it.

112.    On or about October 1, 2015, Boston Police Department took custody of the firearm seized from          and conducted ballistics testing on the firearm. The ballistics testing confirmed that the weapon had been used in a homicide in the Hyde Park area of Boston on September 30, 2015 at approximately 4:00 a.m. Location information from Target Telephone #1 showed that it was in the vicinity of the homicide at the time of the homicide.

BONHEUR intercepted discussing drugs in the basement.

113.    On November 16, 2016 at approximately 10:38 p.m., BONHEUR called and the call was intercepted over Target Telephone #6. BONHEUR said, "You know the stick?. . . The one that's in the hockey bag."          replied, "I took the, the 30 grams one." BONHEUR told          not to take that one but rather take the "stick" that's in the "bag."          asked, "In the basement?" BONHEUR affirmed. Investigators believe          was at Target Location #2 during this call because that is the location where BONHEUR was living and using to store the heroin throughout this investigation.

## (3)    2075 Dorchester Avenue – Target Location #3

### Description of Target Location #3

114.    2075 Dorchester Avenue, Boston, Massachusetts, which is more particularly, described as a commercial building, with smooth exterior walls that are gray in color, with white trim, and having an asphalt shingled roof. The building is located on the west side of Dorchester Avenue. It is situated at the south-west corner of the intersection of Dorchester Avenue and Gallivan Boulivard. There is an asphalt parking lot to the front and left side of the building. The rear border of the parking lot is lined with a cement wall that is pink in color. On the top of this wall is a wood fence that is white in color. Bordering the left side of the parking lot is a metal chain-link fence. The front of the building faces Dorchester Avenue. On the right side of the buildings front is a rounded brick and asphalt step which leads to a white entry door. On the top half of this door is a clear glass window. This is the door to which we seek access. A detailed description appears in Attachment A-3, which is attached hereto and incorporated herein by reference.

55

Link to Criminal Activity

115.    As set forth above in paragraph 58, on October 8, 2015, ANTOINE,

and others met at Target Location #3 to organize a trip that           and others

took to Mexico for the purpose of smuggling drugs back into the United States.  During the

course of the meeting at Target Location #3, investigators observed ANTOINE meet briefly with

a number of people who arrived at Target Location #3.  Some of those meetings took place

inside Target Location #3 and others took place in the parking lot.  After the meeting,

investigators intercepted a call between ANTOINE and           in which ANTOINE told

that he had made a number of "transactions" while at Target Location #3 ("All them

transactions I was just doing in there nigga, don't get me noted . . . I don't think it was anything

crazy, but I'm at the crib right now.  I'm at the spot.").  Accordingly, I believe there is probable

cause that evidence of ANTOINE's ongoing drug trafficking activities, as set-forth in

Attachment B, will be found at Target Location #3.

**(4)**



118.    For example, on Friday, October 9, 2015 at approximately 11:27 a.m., MSP Trooper S. Candito observed a black BMW, Massachusetts Registration 3AX146, which is registered to ANTOINE, leave 175 Menlo Street, Brockton, MA.  Trooper Candito followed the vehicle to 173 Porter Street ("Target Location #4").

119.    At approximately 12:54 p.m., Trooper Candito observed a white Mercedes Benz bearing MA Registration RSW635 pull into the driveway at Porter Street, next to the BMW.  The Mercedes was occupied by two black males.  At approximately 12:55 p.m., Trooper Candito observed ANTOINE exit Target Location #4 holding a large "gym style" black bag.  Trooper Candito then observed ANTOINE get into the left rear seat of the Mercedes Benz.

120.    At approximately 1:05 p.m., Trooper Candito then observed ANTOINE exit the same left rear seat of the Mercedes and walk back toward the Porter Street residence. ANTOINE did not have the black bag at this time.  A check with the Massachusetts Registry of Motor

Vehicles revealed that registration RSW635 belonged on a white 2015 Mercedes Benz, registered to Target Subject ▮▮▮▮▮▮.

121.    As detailed above in paragraph 76, on October 22, 2015, ▮▮▮▮ and ANTOINE were intercepted discussing marijuana packages that had been sent to members of the ANTOINE DTO. One of those packages was delivered to Target Location #4.

122.    In addition and as detailed above, ▮▮▮▮ wired money to ▮▮▮▮ to purchase heroin on October 22, 2015. ▮▮▮▮ was intercepted talking to ANTOINE about the package and called UPS attempting to track the package after it was seized by law enforcement.

123.    Finally, ▮▮▮▮ traveled to Mexico on October 18, 2015 with three other females for the purpose of transporting controlled substances back to the United States. As such, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set-forth in Attachment B, will be located at Target Location #4.

## CONCLUSION

124.    Based on the information set forth above, I believe probable cause exists to conclude that the ANTOINE, BONHEUR, ▮▮▮▮ and ▮▮▮▮ have conspired and continue to conspire to possess with intent to distribute, and to distribute, heroin and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that evidence of said criminal offenses, as set forth in Attachment B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

    //

    //

58

I, Scott F. Dunn, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

SCOTT F. DUNN
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

23rd
Subscribed and sworn to me this the ___th day of
November 2015.

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

-

59